USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

EARL INGARFIELD,

Defendant.

No. 20-CR-146 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Defendant Earl Ingarfield is charged with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2. On March 17, 2023, Ingarfield moved to compel the production of *Brady* and/or *Giglio* material regarding a cooperating witness ("CW-1"). A week later, he filed a motion to dismiss the indictment, or in the alternative, to exclude evidence "related to" CW-1, or continue trial. For the reasons that follow, Ingarfield's motions to dismiss and compel are denied, but his motion to continue is granted.

## BACKGROUND

The Court assumes the parties' familiarity with the facts and procedural history of this case and summarizes only the background relevant to the motions at issue. As alleged in the indictment, from at least in or about 2013 to at least in or about March 2014, Ingarfield controlled a mining company called Suburban Minerals Corp. ("SUBB") and purportedly engaged in a "pump-and-dump" scheme to manipulate SUBB's stock price. At trial, the government expects to call CW-1 to testify that he, along with other co-conspirators, aided Ingarfield in this scheme. More specifically, CW-1 is expected to testify that he helped Ingarfield purchase international shell corporations that could be used to hold shares of penny stock companies such as SUBB. CW-1 is

further expected to testify that the proceeds earned from the sale of manipulated SUBB stock were sent to accounts he controlled, and that, under Ingarfield's direction, he disbursed the proceeds to various recipients, including co-conspirators.[1] *See* Gov't Mot. 6-7, ECF No. 49.

CW-1 was first arrested in December 2014, in connection with a separate investigation conducted by the U.S. Attorney's Office for the Eastern District of New York ("EDNY") and the Federal Bureau of Investigation ("FBI"). The EDNY's investigation centered on shell entities in Belize and an individual named Robert Bandfield, who eventually pled guilty to a money laundering conspiracy and was sentenced to six years' imprisonment. *See United States v. Bandfield*, No. 14-cr-476 (E.D.N.Y. Sept. 8, 2014). CW-1 began cooperating shortly after his arrest, sitting for four days of proffers between December 2014 and January 2015. In addition to representatives from the EDNY and FBI, Homeland Security Investigations ("HSI"), the Securities and Exchange Commission ("SEC"), and the Internal Revenue Service ("IRS") were also present at these proffers. Critically, the U.S. Attorney's Office for the Southern District of New York ("SDNY") was not involved in these proffers, or the *Bandfield* investigation more generally.

According to the FBI 302 report of the proffer held on December 18, 2014, before the interview started, CW-1's attorney stated that CW-1 had contacted a law firm in May 2011 regarding a potential qui tam action. CW-1 also spoke with an agent at the FBI's D.C. Office in September 2013, Special Agent Greg Bretzing, and filed a "Tip, Complaint, or Referral" form ("Form TCR") with the SEC in September 2014.[2]

---

[1] Ingarfield asserts that CW-1 was acting as his attorney during this time frame, although the government disputes that CW-1 ever represented Ingarfield in a legal capacity. *See* Def. Mot., ECF No. 58; Gov't Opp., ECF No. 75.

[2] A Form TCR "may be used by anyone wishing to provide the SEC with information concerning a possible violation of the federal securities laws." *See* SEC Form TCR, Privacy Act Statement, available at https://www.sec.gov/files/formtcr.pdf.

Thereafter, in March 2015, HSI and the SEC opened independent investigations into a brokerage firm called Alpine Securities. HSI's investigation was eventually brought to the SDNY, and a grand jury was empaneled. As part of this investigation, the SDNY made an access request to the SEC for its files on Alpine Securities. The SEC had also conducted a separate investigation of SUBB three years earlier, in 2014, which resulted in a cease trading order being issued on March 7, 2014.[3] In October 2017, pursuant to another access request, the SDNY received materials from the SEC related to its SUBB investigation.

In May 2018, the SDNY made a request to speak with CW-1 about specific stocks that had been cleared through Alpine Securities, including those of SUBB. The EDNY and FBI then made an "initial inquiry" with CW-1 on May 24, 2018, Gov't Opp. 4, ECF No. 85, during which CW-1 identified Ingarfield as the person principally responsible for the SUBB scheme. CW-1 subsequently spoke with the SDNY and HSI five times before Ingarfield was indicted, and six more times after the indictment. At the first three of these interviews—which took place on June 13, 2018, June 26, 2018, and November 13, 2019—personnel from the EDNY and FBI were also present. *See* Gov't Supp. Br., Ex. A, ECF No. 96.

As relevant to the present motions, the government represents that it has produced the following materials to the defense: (1) all FBI 302s for proffers of CW-1, including those conducted by the EDNY in connection with the *Bandfield* investigation; (2) all materials obtained from the SEC pursuant to the SDNY's access requests; and (3) charging and related documents regarding CW-1's case, including the criminal complaint, plea transcript, and cooperation agreement, as well as a violation report. The government produced the FBI 302s and the SEC

---

[3] *See* SEC, Release No. 71661, Mar. 7, 2014, at https://www.sec.gov/litigation/suspensions/2014/34-71661.pdf.

materials to the defense a year and a half ago, in November 2021. CW-1's charging and related documents were produced on March 22, 2023—after Ingarfield filed his motion to compel, but before the agreed upon date of April 3, 2023 for the disclosure of Jencks Act and *Giglio* material. *See* Gov't Opp. 1 n.1, ECF No. 85.

In his motion to compel, Ingarfield argues that he is further entitled to: (1) the Form TCR that CW-1 submitted to the SEC in September 2014; (2) the log of materials withheld from the government by the SEC taint team related to the Form TCR; (3) all reports and notes of FBI Special Agent Bretzing related to CW-1; (4) all written communications between CW-1 or his attorney and the SEC; and (5) all written communications between CW-1 or his attorney and the FBI. After receiving the government's March 22 disclosure of CW-1's charging and related documents, Ingarfield subsequently filed an additional motion to dismiss the charges, or in the alternative, to exclude evidence "related to" CW-1, or continue trial. In that motion, Ingarfield argues that the government violated its *Brady* obligations by not producing impeachment material in a timely manner. Ingarfield further requested (1) that the Court review CW-1's presentence report *in camera* for any impeachment material; (2) all FBI 302s "from the case against CW-1"; (3) all FBI 302s regarding CW-1's cooperation in the *Bandfield* case; and (4) the transcript from CW-1's detention hearing in the *Bandfield* case, which remains under seal.[4] Def. Mot. 2, ECF No. 88.

## DISCUSSION

### I.   Applicable Law

In a criminal prosecution, the government has a due process obligation to disclose evidence that is materially favorable to the defense. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United*

---

[4] The government represented at oral argument that a presentence report for CW-1 has not yet been prepared. The government further represented that all FBI 302s from CW-1's proffers, including in the EDNY, were produced to the defense in November 2021. The defense does not dispute these assertions.

*States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004). Favorable evidence includes information that is exculpatory, as well as evidence that could be used to impeach a key government witness. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). This obligation extends "to material evidence . . . that is known to the prosecutor," *United States v. Hunter*, 32 F.4th 22, 35 (2d Cir. 2022), and the prosecution is "presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

That said, the Second Circuit has "long rejected the notion that 'knowledge of any part of the government is equivalent to knowledge on the part of the prosecutor.'" *Hunter*, 32 F.4th at 36 (quoting *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971)). As it observed in *Avellino*,

> knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis.

136 F.3d at 255 (internal quotation marks omitted). Instead, courts must determine whether the person alleged to be "acting on the government's behalf in a case" can be considered "part of the 'prosecution team.'" *Hunter*, 32 F.4th at 35-36 (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)); *see also Stewart*, 433 F.3d at 298 ("[T]he relevant inquiry is what the person *did*, not who the person *is*." (emphasis in original)).

As another court in this district recently observed, "[t]he Second Circuit has not yet articulated a test to decide when knowledge of *Brady* material may be imputed from one agency to another." *United States v. Velissaris*, 2022 WL 2392360, at *2 (S.D.N.Y. July 3, 2022). In the

5

absence of such express guidance, courts in this district have held that "[w]hether the Government's discovery obligations extend to materials in possession of another government agency turns on whether the Government and the other agency conducted a 'joint investigation.'" *United States v. Alexandre*, 2023 WL 416405, at *5 (S.D.N.Y. Jan. 26, 2023) (quoting *United States v. Martoma*, 990 F. Supp. 2d 458, 460 (S.D.N.Y. 2012)). Those courts have considered five factors in determining whether a "joint investigation" occurred: whether the other agency "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D.N.Y. 2018)). Regardless of whether this five-factor test is ultimately adopted by the Second Circuit, it is clear that "[i]nteracting with the prosecution team, without more, does not make someone a team member." *United States v. Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013), *aff'd sub nom.*, *United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015). Rather, "under the totality of the circumstances, the more involved individuals are with the prosecutor, the more likely they are team members." *Id.*

## II. The Government Entities At Issue

### A. The SEC

Ingarfield first asserts that the SEC was part of a joint investigation with the SDNY because the SEC shared documents with the prosecution team pursuant to two access requests. That argument, however, has been rightly—and repeatedly—rejected in this district. *See, e.g.*, *United States v. Alexandre*, 2023 WL 416405, at *6 ("[A]ccess grants between governmental agencies,

which are hardly uncommon, do not indicate by themselves a joint investigation, particularly given the Government's representation that it did not direct the CFTC or the Receiver to take any investigative actions."); *Velissaris*, 2022 WL 2392360, at *3 ("To the extent that the USAO has relied on evidence gathered from the SEC, that evidence was gathered before the USAO began its own investigation, and was not performed under its direction."); *Blaszczak*, 308 F. Supp. 3d at 738 (finding no joint investigation even though "[t]he SEC provided the USAO with all the documents it obtained during its investigation"); *United States v. Connolly*, 2017 WL 945934, at *7 (S.D.N.Y. Mar. 2, 2017) (observing that "inter-agency document production is not dispositive of joint fact-gathering"). Courts have been particularly hesitant to find a joint investigation where the document sharing only went in one direction. *See Alexandre*, 2023 WL 416405, at *6 (reasoning that access grants are not indicative of a joint investigation "especially . . . where, as here, the information sharing largely flowed only in one direction"); *United States v. Collins*, 409 F. Supp. 3d 228, 242 (S.D.N.Y. 2019) ("[A]lthough the SEC shared some documents it obtained using subpoenas, the USAO did not share any documents it obtained using grand jury subpoenas with the SEC."); *Middendorf*, 2018 WL 3956494, at *5 (finding no joint investigation in part because the SEC did not review documents gathered by the USAO).

Ingarfield also points to the fact that the government plans to call Stephen Johnson, "an investigator for the SEC," to testify at trial. Def. Ltr. 2, ECF No. 108. But merely testifying on behalf of the prosecution does not make a government employee a member of the prosecution team. *See United States v. Stewart*, 433 F.3d 273, 298-99 (2d Cir. 2006). The government has represented that Mr. Johnson will testify as "a custodian from the SEC to authenticate trading data that was produced to [the government] as part of our access request," but he is "not an individual who at any point worked on the investigation." Hr'g Tr. 46:6-10 (Apr. 6, 2023). And, as the

Second Circuit observed in *Stewart*, the fact that a witness acted "only in the capacity of an expert witness" indicates that he acted "not as a fully functioning member of the prosecution team." 433 F.3d at 299. That proposition is equally if not more true here, where the witness is being called solely as a custodian of records. While Mr. Johnson represents that, as a general matter, his "duties with the Commission" involve "assist[ing] in investigations into possible violations of securities laws," Def. Ltr., Ex. B, ECF No. 108, there is no indication that he played such a role in this particular case, outside of his anticipated testimony as a government witness.

Finally, Ingarfield argues that, based on CW-1's filing of the Form TCR in September 2014, "[i]t would be reasonable to infer that . . . the United States Attorney was provided with [CW-1's] information for purposes of this prosecution." Def. Mot. 12, ECF No. 83. But Ingarfield does not dispute—and the Court has no reason to doubt—the government's assertion that it has disclosed all of the materials it received pursuant to the access requests and is not in possession of any other requested documents, such as the Form TCR filed by CW-1. *See United States v. Avenatti*, 559 F. Supp. 3d 274, 285 (S.D.N.Y. 2021) (denying motion to compel *Brady* material based on the government's "good faith representation" that it had complied with its obligations and would continue to do so). The Court thus finds that the SEC was not on the government's prosecution team in this case.

### B. The EDNY and FBI

Next, Ingarfield argues that the office and agency which oversaw the *Bandfield* case—namely, the EDNY and FBI—are also part of the instant prosecution team, because they participated in an interview of CW-1 on May 24, 2018 about the conduct at issue in this case, and subsequently attended three joint interviews of CW-1 with the SDNY and HSI.

But as is the case with document sharing, the Court agrees with the courts in this district which have held that participating in joint interviews of a witness does not, without more, establish the existence of a joint investigation. *See, e.g.*, *Velissaris*, 2022 WL 2392360, at *2 ("[J]ointly conducted interviews, standing alone, do not support a conclusion that the SEC and USAO have conducted a joint investigation, particularly where the defendant's request is not limited to information about those interviews." [5]); *Collins*, 409 F. Supp. 3d at 242 (finding no joint investigation between the SEC and USAO where the agencies conducted 16 joint interviews out of 60 total interviews, and the SEC took no notes during these interviews); *Blaszczak*, 308 F. Supp. 3d at 738 (finding no joint investigation between the SEC and USAO where the agencies conducted "39 witness interviews in tandem . . . only as a matter of convenience"); *Middendorf*, 2018 WL 3956494, at *5 (finding no joint investigation between the SEC and USAO where "beyond conducting joint [witness] interviews, the Government and SEC have not coordinated their separate fact-finding efforts"). Ingarfield has not cited any authority to suggest that this conclusion should differ under the circumstances presented here, where the SDNY is using a cooperating witness signed up by another U.S. Attorney's Office. *Cf. United States v. Merced*, 2021 WL 5826286, at *6 (S.D.N.Y. Dec. 8, 2021) (finding no joint investigation between the DEA and USAO where the DEA agents "who made the initial narcotics arrest of the cooperating witness . . . participated in the initial proffers of the witness, but had no other substantial involvement in the investigation or prosecution from that point forward").

---

[5] Speaking to the policy implications, Judge Cote rightly recognized that "[i]f the SEC were considered part of a prosecutor's team solely because there were jointly conducted interviews, prosecutors would likely cease to participate in such interviews and the efficiencies for witnesses and investigators that arise from jointly conducted interviews would quickly disappear." 2022 WL 2392360, at *2 n.2.

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012), on which Ingarfield relies, is inapposite. In *Gupta*, the SDNY and SEC brought parallel criminal and civil actions against the defendant. The "[o]verwhelming bulk of witness interviews were jointly conducted" by the two agencies—forty-four, to be exact—and after each interview, the SEC attorney "prepared memoranda that summarized what he felt were the relevant parts of the interviews." *Id.* at 493-94. Furthermore, "[i]n preparing these memoranda, [the SEC attorney] frequently consulted with the AUSAs." *Id.* at 494. The court thus concluded that the SDNY and SEC engaged in "joint fact-gathering," which brought the SEC within the prosecution team. *Id.*; *see also Martoma*, 990 F. Supp. 2d at 461-62 (finding a joint investigation where the USAO and the SEC conducted twenty joint interviews of twelve witnesses, coordinated efforts in conducting depositions, and conferred with each other about their parallel investigations). Here, by contrast, there were no parallel or coordinated investigations. The EDNY and FBI conducted only four interviews of CW-1—one as an initial inquiry into the subject matter at issue, and three jointly with the SDNY—all after the *Bandfield* case had already concluded. And other than a formal access request for *Giglio* material, there is no allegation that the SDNY relied on the EDNY or FBI to provide notes, memoranda, or any other insight on the fact-gathering process in Ingarfield's case.

Nor are Ingarfield's remaining authorities persuasive. In *United States v. Bin Laden*, 397 F. Supp. 2d 465 (S.D.N.Y. 2005), for instance, a former al Qaeda member cooperating with the SDNY was placed in the Witness Security Program ("WitSec") and relocated to an undisclosed location. *See id.* at 474. At first, the witness met with prosecutors at "neutral sites," but the prosecutors later requested that the U.S. Marshals Service ("USMS")—which administers the WitSec program—install videoconferencing equipment in the relocation area to facilitate more efficient communication, motivated primarily by the "desire to be able to contact [the witness]

10

quickly in the event that they needed to show him photographs of suspected terrorists." *Id.* at 474-75. The USMS videorecorded these conferences because, given the limitations of the computer system at the relocation area, they were unable to make detailed written reports containing classified information. *Id.* at 475. The prosecutors were unaware of the recordings at the time, and they turned over the transcripts of the tapes once they learned of their existence. The prosecutors argued, however, that any delay in disclosure could not amount to a *Brady* violation because the USMS's WitSec division, "an entity allegedly wholly independent of the prosecution team," was solely responsible for the recordings. *Id.* at 481. The district court disagreed. Reasoning that "WitSec, in order to further the Government's investigation, installed and continuously operated the video-teleconference equipment at the prosecutors' request," the court concluded that "[the witness's] WitSec team could be fairly described as part of the prosecution team." *Id.* at 484-85. It also noted that Witsec Inspector John Doe,[6] who was "responsible . . . for day-to-day contact with" the witness, "on occasion sought to aid the investigative effort by doing more than simply operating the teleconference equipment," including by having the witness review a recorded phone call made to another al Qaeda operative and then informing prosecutors of a substantive issue that had arisen from that review. *Id.* at 485.

Unlike in *Bin Laden*, the EDNY did not "continuously" aid the SDNY's investigation at the SDNY's request. Rather, it merely provided access to its cooperating witness and attended three initial interviews of that witness. And while the EDNY also turned over materials related to CW-1 pursuant to a formal access request from the SDNY—all of which, Ingarfield does not dispute, have been disclosed to the defense—as discussed above, such a one-way access grant is

---

[6] The *Bin Laden* court referred to this WitSec Inspector by a pseudonym due to the security concerns of the WitSec program.

11

not indicative of a joint investigation.[7] *See Alexandre*, 2023 WL 416405, at *6. Beyond those routine forms of coordination, there is no indication that the EDNY provided any additional support for the SDNY's investigative efforts.

The *Bin Laden* court drew guidance from two out-of-circuit cases, also cited by Ingarfield, but both are again distinguishable. In *Mastracchio v. Vose*, 274 F.3d 590 (1st Cir. 2001), a cooperating witness received "numerous exorbitant perquisites" for his protective custody, including "large cash payments, state-subsidized sky-diving lessons, access to illegal drugs, free passage through corridors of the police station where he was being held, out-of-state trips to visit family and various unsupervised excursions." *Bin Laden*, 397 F. Supp. 2d at 482 (citing *Mastracchio*, 274 F.3d at 594-97). While the witness's protection team was aware of these benefits, the prosecutors were not. The First Circuit held that the benefits should have been disclosed to the defense, because "[h]aving placed [the witness] on the stand to testify on behalf of the state, the prosecutor had a duty to learn of all the inducements and rewards that the state had tendered." *Mastracchio*, 274 F.3d at 600-01. In the instant case, no such "unorthodox" inducements are alleged to have been made. *Id.* at 598.

Finally, in *United States v. Wilson*, 237 F.3d 827 (7th Cir. 2001), a witness testified at trial that he had not failed any drug tests while in the WitSec program, when in fact he had failed three. *Id.* at 831. The prosecutors did not become aware of this fact until one month after the guilty verdict was returned, when the USMS notified them that the witness had been terminated from WitSec because of his failed drug tests. *Id.* The Seventh Circuit concluded, without extensive analysis, that "imputation is proper in these circumstances" because "it is impossible to say in good

---

[7] Indeed, the fact that the SDNY needed to issue an access request at all in order to receive information about the *Bandfield* investigation further supports the conclusion that the two U.S. Attorney's Offices did not conduct a joint investigation.

conscience that the U.S. Marshal's Service was not 'part of the team' that was participating in the prosecution, even if the role of the Marshal's Service was to keep the defendants in custody rather than to go out on the streets and collect evidence." *Id.* at 832. *Wilson* made no comment on joint witness interviews or witness sharing, and thus has limited applicability here. Thus, given the weight of existing case law, and the fact that the EDNY and FBI did not engage in any joint fact-gathering with the SDNY beyond the sharing of their cooperating witness and related documents, the Court concludes that the government is not obligated to seek further information about CW-1 from the *Bandfield* investigation.

Even if the Court were to find that the government's *Brady* obligations did extend to the *Bandfield* investigation, the government has represented that it requested "all *Giglio* materials" from the EDNY through an access request, and that it has already produced those materials to the defense. Hr'g Tr. 32:23-33:1. There is no authority supporting Ingarfield's contention that he is entitled to more, including, as he urges, "all FBI 302 reports from the case against CW-1." Def. Mot. 2, ECF No. 88; *see also* Hr'g Tr. 34:3-4 ("I want the reports of [the government's] investigation of CW-1 that culminated in his arrest."). That request is clearly overbroad, as defendants are not entitled under *Brady* to an entire investigative file that may touch upon a witness. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("We have never held that the Constitution demands an open file policy . . . and the rule in *Bagley* (and hence, in *Brady*) requires less of the prosecution than . . . any evidence tending to exculpate or mitigate."). The Court thus denies Ingarfield's motion to compel, as well as his motion to dismiss the charges.[8]

---

[8] In his motion to dismiss, Ingarfield also argues that the government's disclosure of *Giglio* material on March 22, 2023 was untimely. The parties had agreed, however, to exchange Jencks Act material on April 3, 2023, *see* ECF No. 72, and "the practice in this District is to provide *Giglio* and Jencks Act material at the same time, which should be at least one day prior to the testimony of the witness." *United States v.*

13

\* \* \*

The Court is sympathetic to Ingarfield's argument that it is inherently unfair for the government to be able to "pick and choose" what information it requests from other agencies and offices. *See* Hr'g Tr. 39-17. For example, although the government categorically requested materials related to SUBB and Alpine Securities from the SEC, it chose not to request additional materials related to CW-1, including information about the Form TCR and his whistleblower activities. And while it sought out *Giglio* material regarding CW-1 from the EDNY, it chose not to request additional information about his underlying criminal conduct. But although it may have been prudent for the government to seek to learn more about a critical cooperating witness in its case, it was not obligated to do so.

In any event, the defense is hardly left with nothing. As stated above, the government has already disclosed CW-1's charging documents, plea transcript, and cooperation agreement, as well as the FBI 302s from CW-1's proffers. Those 302s include a 37-page report detailing CW-1's participation in various market manipulation schemes. Ingarfield represents that Robert Bandfield and another individual named in the 302 report, Philip Kueber Sr., have since passed away, *see* Hr'g Tr. 38:23, but the FBI 302s name numerous other individuals who may still be available to the defense for interview.[9]

While the Court is denying Ingarfield's motion to compel and motion to dismiss the

---

*Rivera*, 2017 WL 1843302, at \*2 (S.D.N.Y. May 8, 2017) (quoting *United States v. Reyes*, 417 F. Supp. 2d 257, 261 (S.D.N.Y. 2005)).

[9] It is also worth noting that because the government produced the FBI 302s for CW-1's proffers in November 2021—including the 302 that mentions CW-1's filing of the Form TCR—the defense has had plenty of time to obtain the documents it now seeks directly from the SEC, through, among other things, a Freedom of Information Act request. The defense has not indicated that it tried to do so, and despite knowing about the Form TCR for a year and a half, only filed its motion to compel on March 17, 2023, three weeks before trial was scheduled to begin.

charges, in an exercise of its discretion, it grants his motion for a continuance. This continuance will give the defense an opportunity to further investigate the *Bandfield* case, much of which appears to be available on the public docket. *See United States v. Bandfield*, No. 14-cr-476 (E.D.N.Y. Sept. 8, 2014). As to the defense's request for sealed material from CW-1's case, including, among other things, the transcript of his detention hearing, defense counsel may make an application to the appropriate judge in the Eastern District of New York to unseal those materials. *See* Def. Mot. 2, ECF No. 88.[10]

## CONCLUSION

For the foregoing reasons, Ingarfield's motions to dismiss and to compel are denied, but his motion to continue trial is granted. As the parties were previously advised, given defense counsel's availability and the Court's own trial schedule, this trial is hereby adjourned to July 24, 2023. A final pre-trial conference will be held on July 20, 2023 at 2:30 p.m. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 82 and 87.

SO ORDERED.

Dated:  April 27, 2023
        New York, New York

                                            Hon. Ronnie Abrams
                                            United States District Judge

---

[10] Finally, the Court sees no reason to hold an evidentiary hearing in this matter, where none of the critical facts are meaningfully disputed by the defense. *See United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998) (holding that in "the absence of . . . a nonspeculative basis for inferring that . . . the government had not made available to [the defendant] all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary").